IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

JAMES HARPER,                        :
                                     :    CIVIL ACTION NO.: 1-20-cv-00771
                                     :
           Plaintiff,                :    COMPLAINT
                                     :
     v.                              :    JURY TRIAL DEMANDED
                                     :
CHARLES P. RETTIG,                   :
IN HIS OFFICIAL CAPACITY AS          :
COMMISSIONER                         :
INTERNAL REVENUE SERVICE,            :
                                     :
           &                         :
                                     :
INTERNAL REVENUE SERVICE,            :
                                     :
           &                         :
                                     :
JOHN DOE IRS AGENTS 1-10,            :
                                     :
                                     :
           Defendants.               :

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF. NO. 12)

**Jared Bedrick**
Champions Law
170 West Road, Suite 6D
Portsmouth NH 03801
NH Bar No. 20438
(857)301-7418
jared@champions.law

**Caleb Kruckenberg**
Litigation Counsel
**Aditya Dynar**
Litigation Counsel
New Civil Liberties Alliance
Appearing *Pro Hac Vice*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ......................................................................................................... 1

DISCUSSION ................................................................................................................ 1

I. This Court Has Jurisdiction over Mr. Harper's Lawsuit .......................................... 1

   A. IRS Has Waived Sovereign Immunity for Mr. Harper's Claims .......................... 2

   B. Neither the Anti-Injunction Act Nor the Declaratory Judgment Act Precludes Relief in this Case ...................................................................................................................... 3

      1. Legal Standard for Divestment of Jurisdiction ................................................ 4

      2. Neither Statute Applies Here Because Mr. Harper's Lawsuit Is Not a Tax Collection Claim ................................................................................................................ 7

      3. Even If the Statutes Applied, Because Mr. Harper Has No Other Remedy for IRS's Constitutional Violations, They Do Not Bar Suit Here ................................... 10

   C. Mr. Harper Can Seek Damages for Constitutional Violations Committed by Individual Officers .................................................................................................................... 10

   D. The Administrative Exhaustion Requirement Does Not Apply to the Causes of Action at Issue Here ........................................................................................................................ 13

II. Mr. Harper Has Sufficiently Pled that IRS Violated His Constitutional and Statutory Rights ........................................................................................................................................ 14

   A. IRS Does Not Dispute It Acquired Mr. Harper's Information Without a Lawful Subpoena ................................................................................................................... 14

   B. IRS Violated the Fourth Amendment .................................................................. 16

      1. The Fourth Amendment Significantly Restrains the Types of Searches IRS May Conduct ....................................................................................................................... 16

      2. *Miller* Does Not Apply to this Case Because Mr. Harper Had a Contractual Expectation that His Information Would Not Be Shared ................................. 19

      3. Mr. Harper Has a Reasonable Expectation of Privacy in His Records ....................... 22

      4. Any John Doe Subpoena Was a Trespass that Violated the Fourth Amendment ......... 24

   C. IRS Violated the Fifth Amendment ...................................................................... 25

CONCLUSION .............................................................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524 (D.C. Cir. 2015) ............................. 11
*Barron v. United States*, 998 F. Supp. 117 (D.N.H. 1998) ................................................................ 12
*Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) .................................... 10
*Bob Jones Univ. v. Simon*, 416 U.S. 725 (1974) .................................................................................. 4, 5
*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................................................ 2
*Boyd v. United States*, 116 U.S. 616 (1886) .................................................................... 17, 18, 22
*Brower v. County of Inyo*, 489 U.S. 593 (1989) .................................................................................. 18
*California v. Ciraolo*, 476 U.S. 207 (1986) ............................................................................................ 22
*Canada v. United States*, 950 F.3d 299 (5th Cir. 2020) .................................................................. 12
*Carpenter v. United States*, 138 S.Ct. 2206 (2018) .............................................................. passim
*Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) ...................................................... passim
*Davis v. Passman*, 442 U.S. 228 (1979) .................................................................................................. 11
*Direct Marketing Association v. Brohl*, 575 U.S. 1 (2015) ...................................................... 6, 8, 9
*Ecclesiastical Order of the ISM of Am, Inc. v. IRS*, 725 F.2d 398 (6th Cir. 1984) ....................... 5
*Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1 (1962) .............................................................. 4
*Entick v. Carrington*, 19 How. St. Tr. 1029 (1765) ........................................................................ 17
*Ex parte Jackson*, 96 U.S. 727 (1878) .................................................................................................. 19
*Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202 (9th Cir. 2019) ..................................... 11
*Flora v. United States*, 362 U.S. 145 (1960) ............................................................................................ 5
*Florida v. Jardines*, 569 U.S. 1 (2013) .................................................................................................. 22
*Hernandez v. Mesa*, 140 S. Ct. 735 (2020) ............................................................................................ 12
*Hibbs v. Winn*, 542 U.S. 88 (2004) ............................................................................................................ 6
*In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996) ......................................................... 5
*Kemlon Prod. & Dev. Co. v. United States*, 638 F.2d 1315 (5th Cir. 1981) .................................. 9
*Liddle v. Salem Sch. Dist. No. 600*, 249 Ill. App. 3d 768 (Ill. App. Ct. 5th Dist. 1993) .............. 24
*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......................................................................................... 25
*McCarthy v. Marshall*, 723 F.2d 1034 (1st Cir. 1983) ...................................................... 5, 6, 7
*McMillen v. U.S. Dep't of Treasury*, 960 F.2d 187 (1st Cir. 1991) .............................................. 12
*Muirhead v. Mecham*, 427 F.3d 14 (1st Cir. 2005) ............................................................................ 2
*NFIB v. Sebelius*, 567 U.S. 519 (2012) .................................................................................................... 4
*Nogueras-Cartagena v. United States*, 125 F. App'x 323 (1st Cir. 2005) (unpublished) ............ 13
*Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946) .............................................. 22
*Perlowin v. Sasse*, 711 F.2d 910, 911 (9th Cir. 1983) ..................................................................... 5
*Presley v. United States*, 895 F.3d 1284 (11th Cir. 2018) ................................................ 21, 22
*Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539 (D.C. Cir. 1994) .............................................. 23
*Rivera v. IRS*, 708 Fed. Appx. 508 (10th Cir 2017) (unpublished) ............................................. 10
*Sargent v. Gile*, 8 N.H. 325 (N.H. 1836) ............................................................................................ 24
*See Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003) ...................................................................... 24
*Shreiber v. Mastrogiovanni*, 214 F.3d 148 (3d Cir. 2000) ............................................................ 11
*Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366 (D.C. Cir. 1997) ........................................... 3
*Smith v. Maryland*, 442 U.S. 735 (1979) .............................................................................................. 22
*South Carolina v. Regan*, 465 U.S. 367 (1984). ................................................................................ 10
*Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310 (1985) ............................................ 14, 25

*United States v. Bisceglia*, 420 U.S. 141 (1975)....................................................................... 25

*United States v. Boruff*, 909 F.2d 111 (5th Cir. 1990)............................................................... 23

*United States v. Coinbase, Inc.*, No. 17-cv-1431, 2017 WL 5890052 (N.D. Cal. 2017) (Scott Corley, U.S.M.J.) ........................................................................................................... 15

*United States v. Dorais*, 241 F.3d 1124 (9th Cir. 2001) ............................................................ 23

*United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995) ............................................................... 15

*United States v. Jacobsen*, 466 U.S. 109 (1984)........................................................................ 22

*United States v. Jones*, 565 U.S. 400 (2012) ............................................................ 16, 18, 22, 25

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952)........................................... 25

*United States v. Miller*, 425 U.S. 435 (1976)............................................................................. 19

*United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994)................................................................ 10

*United States v. Sierra-Ayala*, No. CR 17-063, 2019 WL 3526491 (D.P.R. Aug. 2, 2019)......... 24

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ............................................................ 23

*Waters v. Churchill*, 511 U.S. 661 (1994)................................................................................. 25

*We the People Foundation, Inc. v. United States*, 485 F.3d 140 (D.C. Cir. 2007)....................... 7

*Wyo. Trucking Ass'n, Inc. v. Bentsen*, 82 F.3d 930 (10th Cir. 1996) .......................................... 5

*Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015)............................................................... 2, 6, 10

*Zietzke v. United* States, 2020 WL 264394 (N.D. Cal. Jan. 17, 2020) ....................................... 21

*Zietzke v. United States*, 426 F. Supp. 3d 758 (W.D. Wash. 2019) ............................................ 21

**Statutes**

15 U.S.C. § 7609 ..................................................................................................................... 14

26 U.S.C. § 7421 ................................................................................................................... 3, 4

26 U.S.C. § 7433 ..................................................................................................................... 13

26 U.S.C. § 7609 ............................................................................................................ 3, 11, 25

28 U.S.C. § 1331 ....................................................................................................................... 3

28 U.S.C. § 1341 ....................................................................................................................... 4

28 U.S.C. § 2201 ................................................................................................................... 3, 4

5 U.S.C. § 701 .......................................................................................................................... 2

5 U.S.C. § 702 .......................................................................................................................... 3

**Other Authorities**

Donald A. Dripps, *"Dearest Property": Digital Evidence and the History of Private "Papers" As Special Objects of Search and Seizure*, 103 J. Crim. L. & Criminology 49 (2013) ........... 17

Philip Hamburger, *Is Administrative Law Unlawful?* (2014)................................................. 17, 23

## INTRODUCTION

The defendants, the Internal Revenue Service, Commissioner Charles P. Rettig, and John Doe IRS Agents 1-10 (collectively "IRS"), do not dispute that they obtained the private financial information of Plaintiff, James Harper, from a digital currency exchange without following statutory limitations on its power to issue subpoenas. IRS gathered sensitive information about Mr. Harper's use of digital currency, including personally identifying information, balance and transaction information and account and routing numbers for corresponding transactions, without notifying him that it had done so and without following statutory limits on its subpoena power. It also did so despite Mr. Harper's having contracted with the digital currency exchanges to carefully protect his private information against unlawful government intrusion.

IRS's actions violated core constitutional protections under the Fourth and Fifth Amendments. Mr. Harper's contracts provided him with a reasonable expectation of privacy in his private information and provided clear instructions to the exchanges that he had not voluntarily surrendered his Fourth Amendment rights by doing business with the exchanges. But IRS violated those reasonable expectations by seizing his information without any process. Separately, IRS committed a Fourth Amendment trespass against Mr. Harper, by seizing his dearest property—his personal papers—without a warrant. Finally, IRS's refusal to provide Mr. Harper with any notice or opportunity to contest its lawless evidence gathering violated his Fifth Amendment right to due process of law.

IRS hardly challenges any of this. Instead, it focuses on irrelevant and flimsy arguments about jurisdiction. Essentially, IRS argues that Mr. Harper has no means to challenge its illegal behavior. IRS is wrong, and this Court should deny IRS's motion to dismiss.

## DISCUSSION

### I. THIS COURT HAS JURISDICTION OVER MR. HARPER'S LAWSUIT

IRS spends most of its motion challenging this Court's ability to decide whether IRS, a federal agency, violated Mr. Harper's federal constitutional rights and a federal statute governing the agency. IRS is wrong, of course, because this Court most certainly has federal question

jurisdiction to decide Mr. Harper's uniquely federal claims. Moreover, IRS's efforts to avoid this Court's jurisdiction, either through jurisdiction-stripping provisions or administrative exhaustion requirements, are misplaced. This action is not an effort to avoid tax liability—Mr. Harper has paid his taxes—but rather a constitutional challenge to IRS's unlawful data collection.

**A. IRS Has Waived Sovereign Immunity for Mr. Harper's Claims**

IRS's threshold argument, that Mr. Harper's "action is an action against the United States for which there is no waiver of sovereign immunity," proceeds from a basic mischaracterization of Mr. Harper's case. *See* ECF No. 12-1 at 10. Based on *Muirhead v. Mecham*, 427 F.3d 14, 17 (1st Cir. 2005), IRS argues that sovereign immunity bars the suit, because even though the defendants are named officials, "[s]overeign immunity also bars an action against a federal official sued in an official capacity." ECF No. 12-1 at 9. IRS acts as though there is no way that a person can sue a federal agency—but the Administrative Procedure Act (APA), the Declaratory Judgment Act (DJA), and the existence of *Bivens* claims refute that notion.

Mr. Harper has no dispute with the general concept that his lawsuit is largely aimed at official IRS conduct and policy, but this simply does not answer the relevant question of whether IRS is immune to suit. With respect to the actions against IRS itself and Commissioner Rettig, IRS is quite correct that Mr. Harper is suing the government itself. See Amended Complaint at ¶¶ 3-4. But, of course, sovereign immunity bars suit unless there is an "express waiver." *Muirhead*, 427 F.3d at 17. As the First Circuit recognized in *Muirhead*, one such waiver is found in "Administrative Procedure Act, 5 U.S.C. § 701," which "applies to actions of an agency or its officer." *Id*. at 18; *see Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (APA waived sovereign immunity against agency action because "insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damage"). And the IRS has often been held to this waiver of sovereign immunity for declaratory and injunctive relief. *See, e.g.*, *Z St. v. Koskinen*, 791 F.3d 24, 32 (D.C. Cir. 2015) ("[S]ection 702 of the Administrative Procedure Act waives sovereign immunity with respect to suits for nonmonetary damages that allege wrongful action by an agency or its officers or employees, and the instant lawsuit [against

the Commissioner of IRS] fits precisely those criteria.") (citation omitted); *Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) ("The IRS is not special in this regard; no exception exists shielding it—unlike the rest of the Federal Government—from suit under the APA.")

To be sure, the Administrative Procedure Act does not waive sovereign immunity for suits for *money damages*, but that is what a *Bivens* action is for. *See* 5 U.S.C. § 702 (allowing suits for relief "other than money damages"). Suits against individuals in their individual capacities are governed by *Bivens* and not the APA. *See Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) (*Bivens* claims are asserted against government officials in their individual capacities not against the government nor potentially subject to sovereign immunity). Mr. Harper also has a valid *Bivens* claim against the individual defendants in their *personal* capacities. Thus, sovereign immunity does not preclude these claims either.

### B. Neither the Anti-Injunction Act Nor the Declaratory Judgment Act Precludes Relief in this Case

IRS next invokes twin statutes, the Anti-Injunction Act (AIA), 26 U.S.C. § 7421(a), and the DJA, 28 U.S.C. § 2201, and argues that these provisions divest this Court of jurisdiction to hear this lawsuit. ECF No. 12-1 at 12-13. But neither of those closely-related statutes bars this constitutional action that is unrelated to the assessment of Mr. Harper's taxes.

As an initial matter, IRS is partially correct that Mr. Harper relies on the DJA in his effort to obtain a declaratory judgment concerning IRS's unlawful acts. However, that is not the basis of this Court's jurisdiction over this case. Indeed, while IRS notes that "the Declaratory Judgment Act does not confer jurisdiction upon a court, but merely grants a remedy in cases where jurisdiction already exists," that is an accurate, but irrelevant, observation. *See* ECF No. 12-1 at 14. Mr. Harper has raised two federal constitutional claims and one statutory claim under 26 U.S.C. § 7609(f). And Mr. Harper invoked 28 U.S.C. § 1331 in his Amended Complaint, which provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See* Amended Complaint ¶ 7. Thus, as a threshold matter, this Court plainly has federal question jurisdiction over this case.

IRS's more developed argument, that, in certain circumstances, this Court's jurisdiction can be divested by the AIA and tax exception to the DJA does not advance IRS's cause. Neither of those exceptions applies to this case.

### 1. Legal Standard for Divestment of Jurisdiction

Enacted in 1867, the AIA "apparently has no recorded legislative history, but its language could scarcely be more explicit." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (footnote omitted). It states: "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

"The manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962) (interpreting AIA by looking at "comparable" Tax Injunction Act (TIA), 28 U.S.C. § 1341)). The AIA "protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes." *NFIB v. Sebelius*, 567 U.S. 519, 543 (2012).

The DJA, by contrast, is not specifically aimed at curbing tax-related litigation. The DJA merely provides a mechanism by which federal courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. There is, however, one major limitation on the reach of the DJA: it applies to "case[s] of actual controversy within [a federal court's] jurisdiction, except *with respect to Federal taxes* other than actions brought under [S]ection 7428 of the Internal Revenue Code [.]" *Id*. (emphasis added).

This statutory exception, commonly known as the DJA "tax exception," is directly related to the AIA. *Cohen*, 650 F.3d at 728. When first adopted in 1934, the DJA contained no tax exception. A year later, after plaintiffs in several lawsuits sought to use the DJA as an end-run around the AIA, Congress amended the statute by adding the tax exception. *Id*. at 729. The

Senate report related to the proposed tax-exception amendment noted that "[t]he application of the Declaratory Judgment[ ] Act to taxes would constitute a radical departure from the long-continued policy of Congress (as expressed in [the AIA] and other provisions) with respect to the *determination, assessment, and collection of Federal taxes*." *Id.* (emphasis in original, citing S.Rep. No. 1240, 74th Cong., 1st Sess. 11 (1935)). When reading the legislative history, the Supreme Court declared: "[i]t is clear enough that one 'radical departure' which was averted by the amendment was the potential circumvention of the 'pay first and litigate later' rule by way of suits for declaratory judgments in tax cases." *Flora v. United States*, 362 U.S. 145, 165 (1960).

The well-documented history behind the tax exception to the DJA and its relationship to the AIA has led numerous courts of appeal, including the First Circuit, to conclude that the scope of the DJA's tax exception should be read coextensively with the AIA. *See McCarthy v. Marshall*, 723 F.2d 1034, 1038 (1st Cir. 1983) (applying the provisions interchangeably). Indeed, the *en banc* D.C. Circuit emphasized that the DJA tax exception is "coterminous" or "coextensive" with the AIA's prohibition. *Cohen*, 650 F.3d at 730-31. Other Circuits have followed that course. *See, e.g.*, *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996) (finding that "the two statutory texts are, in underlying intent and practical effect, coextensive"); *Wyo. Trucking Ass'n, Inc. v. Bentsen*, 82 F.3d 930, 933 (10th Cir. 1996) (same); *Ecclesiastical Order of the ISM of Am, Inc. v. IRS*, 725 F.2d 398, 404-5 (6th Cir. 1984) (same); *Perlowin v. Sasse*, 711 F.2d 910, 911 (9th Cir. 1983) (same); *Tomlinson v. Smith*, 128 F.2d 808, 811 (7th Cir. 1942) (same).

The AIA has "almost literal effect": It prohibits only those suits seeking to restrain the assessment or collection of taxes. *Bob Jones*, 416 U.S. at 737. Thus, in *Bob Jones University v. Simon*, the AIA precluded injunctive relief when the university lost its status as a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code. 416 U.S. at 739. An injunction would have impacted the university's future tax liability because § 501(c)(3) organizations are exempt from certain taxes. *Id.*

By contrast, the Court has recently clarified the limits of the statutory restraints. Courts have relied heavily on two Supreme Court cases, *Hibbs v. Winn*, 542 U.S. 88 (2004), and *Direct Marketing Association v. Brohl*, 575 U.S. 1 (2015), in interpreting the limits of the AIA. *See Z St.*, 791 F.3d at 30-31 (noting "*Brohl*'s holding is significant" in interpreting AIA); *Cohen*, 650 F.3d at 42 (relying on *Hibbs* in AIA case). In *Hibbs*, 542 U.S. at 92, Arizona taxpayers sought to invalidate an Arizona tax credit that allegedly supported parochial schools in violation of the Establishment Clause. The Court allowed the state taxpayers' suit for declaratory and injunctive relief to proceed despite the comparable TIA, because the suit did not alter the taxpayers' individual tax liability or deplete the state's tax revenue in any way. *See id.* at 107. Indeed, the Court stressed that the TIA does not "stop third parties from pursuing constitutional challenges to tax benefits in a federal forum." *Id*. at 109. Then, in *Brohl*, 575 U.S. at 8, the Court again interpreted the TIA, but stressed that the "words used in both [the TIA and AIA] are generally used in the same way." The Court read the term "restrain" in the statutes as having a "narrow[ ] meaning ... captur[ing] only those orders that stop ... assessment, levy and collection" rather than "merely *inhibit*" those activities. *Id*. at 12-13 (emphasis in original, citation omitted). Thus, the Court held that a suit against a tax law requiring retailers to report tax-related information to the public and tax officials was not barred by the TIA. *Id*. at 14.

In deciding whether a lawsuit is barred by either the AIA or DJA, the First Circuit asks whether "the 'primary purpose' of th[e] action is to prevent the Internal Revenue Service from assessing and collecting income taxes and to restore advance assurance of tax advantages under the Internal Revenue Code." *McCarthy*, 723 F.2d at 1038. A court should also ask whether the exercise of jurisdiction over the case would "obstruct the collection of revenue" or "alter Appellants' future tax liabilities" or "shift the risk of insolvency." *Cohen*, 650 F.3d at 725. If IRS would still be able to collect and assess taxes, then the suit should not be barred. *Id*. Indeed, if the suit "merely inhibit[s]" the collection of taxes, it should not be barred. *Z St.*, 791 F.3d at 31 (quoting *Brohl*, 575 U.S. at 13).

Indeed, the D.C. Circuit emphasized that although "[t]he IRS envisions a world in which no challenge to its actions is ever outside the closed loop of its taxing authority[,]" under Supreme Court precedent, the AIA's prohibition does not sweep that broadly: "'[a]ssessment' is not synonymous with the entire plan of taxation, but rather with the trigger for levy and collection efforts, and 'collection' is the actual imposition of a tax against a plaintiff[.]" *Cohen*, 650 F.3d at 726 (citing *Hibbs*, 542 U.S. at 102). It is no surprise, then, that courts have "allowed constitutional claims against the IRS to go forward in the face of the AIA" and refused to "read[ ] the AIA to reach all disputes tangentially related to taxes." *Id*. at 726-27 (citing *We the People Foundation, Inc. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007)). The key question is whether the action is fundamentally a "tax collection claim," which the Court must determine based upon "a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on assessment and collection." *Id*. at 727

**2. Neither Statute Applies Here Because Mr. Harper's Lawsuit Is Not a Tax Collection Claim**

Even a passing glance at this lawsuit demonstrates that its "primary purpose" has nothing to do with "prevent[ing] the Internal Revenue Service from assessing and collecting income taxes" and thus is not barred by the AIA or DJA. *See McCarthy*, 723 F.2d at 1038.

Perhaps most fundamentally, Mr. Harper *has already paid* all applicable taxes. Mr. Harper's lawsuit challenges IRS's unlawful collection of his private information through its abuse of subpoenas related to his use of digital currencies prior to 2019. *See* Amended Complaint ¶¶ 67-68. But Mr. Harper fully complied with all his tax obligations for 2013 through 2019, which are the relevant years that he owned digital currency. *See* Amended Complaint ¶¶ 29-33, 37, 64-65. Fundamentally, this lawsuit cannot seek to prevent the assessment and collection of income taxes as they were "long-since completed." *See Cohen*, 650 F.3d at 726. As the *Cohen* Court put it, in similar circumstances: "This suit does not seek to restrain the assessment or collection of any tax. The IRS previously assessed and collected the excise tax at issue. The money is in the U.S. treasury; the legal right to it has been previously determined. … Hearing

7

it—whatever its merit—will not obstruct the collection of revenue … alter [Mr. Harper's] future tax liabilities … or shift the risk of insolvency[.]" *See id.*

The AIA's inapplicability is further reinforced when examining the remedy Mr. Harper seeks. This lawsuit is not about the amount of money Mr. Harper, or anyone else *owes* the IRS. Tax liability has no role whatsoever here. The lawsuit is about IRS's illegal collection of private data. *See* Amended Complaint, Counts I-III. Mr. Harper does not seek a refund, or any recalculation of his tax liability. Instead, the relief Mr. Harper seeks is recompense for the constitutional and statutory violations of his protected privacy interests. *See* Amended Complaint, Counts I-III (prayer for relief). This is not a "tax collection claim," it is a constitutional challenge to unlawful actions that were, incidentally, taken by IRS and its agents, thus it is not barred by the AIA. *See Cohen*, 650 F.3d at 727.

IRS's argument that Mr. Harper's lawsuit falls under the restrictions in the AIA (and thus the DJA as well) is not convincing. *See* ECF No. 12-1 at 11. IRS says that Mr. Harper's suit is barred because it "seeks an injunction forcing the IRS to expunge from its records information obtained from potentially thousands of taxpayers, and seeks to stop that information gathering going forward." ECF No. 12-1 at 11. But that is not an entirely accurate description of the lawsuit. Mr. Harper does not seek the expansive system-wide injunction IRS fears. Instead, Mr. Harper seeks a declaration and injunction related to *his* private information, and expungement of *his* private information. *See* Amended Complaint, Counts I-III (prayer for relief). Perhaps others who are similarly situated might seek similar relief; perhaps not. This lawsuit, however, is merely about IRS's violation of Mr. Harper's constitutional rights and has nothing at all to say about his tax liability.

Moreover, even if relief here would alter IRS's future information gathering, by preventing it from unlawfully gathering private information from innocent people, it only relates to past violations of constitutional rights, not how much Mr. Harper (or anyone else) owes IRS. At most it would "merely *inhibit*," in a theoretical sense, future actions related to gathering information about other taxpayers. *See Brohl*, 575 U.S. at 12-13. That is well outside the

limitations envisioned by Congress. *See id.* If IRS were correct, then any action that even arguably impacts IRS's broad asserted power to illegally obtain private information of innocent taxpayers would fall under the AIA provision. But Courts have consistently refused to "read[ ] the AIA to reach all disputes tangentially related to taxes." *See Cohen*, 650 F.3d at 726-27.

IRS's citation to *Kemlon Prod. & Dev. Co. v. United States*, 638 F.2d 1315 (5th Cir. 1981) does not advance its argument. *See* ECF No. 12-1 at 11. First, that out-of-circuit decision is obviously not binding on this Court. And, in any event, it predates the Supreme Court's significant refinement of its case law in the intervening 40 years. In *Kemlon*, the Court refused to "read [the AIA] literally," in favor of the "policy behind the statute" to block a challenge to IRS's disclosure of a company's tax returns. 638 F.2d at 1320. But this holding simply cannot be squared with the Supreme Court's 2015 decision in *Brohl*. In *Brohl* the Court held that a lawsuit challenging a tax law that required retailers to report tax-related information to the public was not a lawsuit meant to restrain the collection of taxes. 575 U.S. at 14. The challenged policy in *Brohl* was nearly identical to that in *Kemlon*, but the Supreme Court insisted that the statutes should not be read to bar such lawsuits. *See id.*

Moreover, *Kemlon* is distinguishable. In *Kemlon* the Fifth Circuit concluded that a company could not seek an injunction against the IRS to stop disclosure of its own tax returns because the IRS's actions might "culminate in the assessment or collection of taxes" from the Plaintiff. 638 F.2d at 1320 (citation omitted). But here, Mr. Harper's challenge has no bearing on the ultimate collection of *his* taxes. He has paid his taxes and IRS does not dispute that he has complied with all obligations. He simply seeks redress for the unconstitutional collection of his private information. Success in this lawsuit would have no effect at all on his tax liability, and thus, does not restrain the collection of his taxes. *See Cohen*, 650 F.3d at 725 ("The money is in the U.S. treasury; the legal right to it has been previously determined.").

Finally, in a passing nod to current precedent, IRS says that because Mr. Harper "has framed his claim as a constitutional violation also does not place it within any of the exceptions to the Anti Injunction Act." ECF No. 12-1 at 13. That puts the cart before the horse. It is not

about *exceptions* to the provisions it is about whether they apply in the first place. Indeed, the unpublished, out-of-circuit case IRS references, *Rivera v. IRS*, 708 Fed. Appx. 508, 511 (10th Cir 2017) (unpublished), makes this point explicitly. The *first step* was to determine if the suit was "for the purpose of restraining the assessment or collection of any tax," and the plaintiff had conceded the suit was aimed at stopping the IRS from "conducting the investigations, audits and other actions complained of as part of the agency's tax assessment and collection efforts[.]" *Rivera*, 708 F. App'x at 511 (quoting 28 U.S.C. 2201(a)). As discussed, the AIA simply does not apply here.

### 3. Even If the Statutes Applied, Because Mr. Harper Has No Other Remedy for IRS's Constitutional Violations, They Do Not Bar Suit Here

Because the AIA is meant to help ensure the payment of taxes, and taxpayers often have a right to seek a refund or other relief, the Court has carefully limited its application in situations where a wronged person has no other remedy for IRS's violation of law. "The Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *South Carolina v. Regan*, 465 U.S. 367, 381 (1984). This is because the purpose of the Act was "*to require that the legal right to the disputed sums be determined in a suit for a refund*." *Id*. at 376 (emphasis in original, citation omitted). Congress meant for taxpayers to file these suits in a different forum. *See id.* But when a plaintiff is "unable to utilize any statutory procedure to contest the constitutionality" of a tax practice, then the AIA "does not bar th[e] suit." *Z St.*, 791 F.3d at 32 (citing *Regan*, 465 U.S. at 380).[1]

### C. Mr. Harper Can Seek Damages for Constitutional Violations Committed by Individual Officers

IRS also argues that Mr. Harper cannot maintain a claim under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), but this argument misstates the nature of Mr.

---

[1] IRS notes in passing that Mr. Harper filed an amicus brief in opposition to the Coinbase subpoena. ECF No. 12-1 at 4. However, IRS does not suggest that this was an alternate avenue for him to challenge IRS's data collection. That is likely because "[i]n the case of a John Doe summons, the Doe has no right to intervene in the hearing on the summons's issuance required by I.R.C. § 7609(f) … and the Doe has no right to file a motion to quash the summons once it has been issued[.]" *United States v. Ritchie*, 15 F.3d 592, 597 (6th Cir. 1994).

Harper's claims. IRS says that Mr. Harper "seek[s] damages against employees of the IRS for violations of the internal revenue laws." ECF No. 12-1 at 17. Not so. Counts I and II contain *Bivens* claims for violations of the Fourth and Fifth Amendments to the U.S. Constitution. Amended Complaint, Counts I & II, ¶¶ 85-135. IRS wrongly states that a *Bivens* claim is unsustainable because "the complaint only alleges that IRS agents made demands for information from virtual currency exchanges without complying with the John Doe summons procedure 'upon information and belief.'" ECF No. 12-1 at 20. However, Mr. Harper does not bring a *Bivens* claim for failure to comply with 26 U.S.C. § 7609(f) (giving the John Doe summons procedure). Amended Complaint, ¶¶ 136-148.

Mr. Harper is not asking to extend *Bivens*. IRS itself admits that *Bivens* claims for violations of the Fourth and Fifth Amendment rights of individuals by federal officers should survive a motion to dismiss. ECF No. 12-1 at 16 (quoting *Shreiber v. Mastrogiovanni*, 214 F.3d 148, 151 (3d Cir. 2000); *Davis v. Passman*, 442 U.S. 228 (1979)). "*Bivens* itself concerned a Fourth Amendment violation by federal officers … [and] a Fourth Amendment damages claim premised on unauthorized electronic surveillance by FBI agents and their surrogates falls directly within the coverage of *Bivens*." *Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1239 (9th Cir. 2019). Moreover, a person harmed by government collection of information may seek a declaratory judgment ordering the information to be deleted. *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 533-34 (D.C. Cir. 2015). Also, a plaintiff that "rests her claim directly on the Due Process Clause of the Fifth Amendment … that her rights under the Amendment have been violated, and that she has no effective means other than the judiciary to vindicate these rights … is an appropriate party to invoke the general federal-question jurisdiction of the District Court." *Davis*, 442 U.S. at 243-244. Such a violation of the Fifth Amendment's Due Process Clause "may be redressed by a damages remedy" under *Bivens*. *Id.* at 248-249. No extension of *Bivens* is therefore necessary because Mr. Harper alleges that his Fourth Amendment right "to be secure in [his] … papers, … against unreasonable searches and seizures" and his Fifth Amendment right not to "be deprived of life, liberty, or property, without

11

due process of law" were violated by IRS agents. Amended Complaint, Counts I & II, ¶¶ 86, 100-103, 106, 112, 114-115, 124-126, 129, 135.

This is not a case asking to extend *Bivens*. Assuming, arguendo, that extension of *Bivens* is called for, IRS's attempt at dismissal on that basis still fails. When asked to extend *Bivens*, courts "engage in a two-step inquiry": (1) "whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants'"; (2) if there is a new context, "whether there are any 'special factors that counsel hesitation' about granting the extension." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (citations omitted).

There is no "new context" or "new category of defendants" here because Mr. Harper's Fourth and Fifth Amendment claims do not "diffe[r] in a meaningful way from *Bivens*, [or] *Davis*"; they specifically fall under the category of claims authorized by *Bivens* and *Davis* against federal officers. *Canada v. United States*, 950 F.3d 299, 307 (5th Cir. 2020). There is no dispute that Mr. Harper alleges that his Fourth and Fifth Amendment rights were violated—a context that falls squarely under *Bivens* and *Davis*.

Even if there were a "new context" or a "new category of defendants," there are no special factors counseling hesitation. *McMillen v. U.S. Dep't of Treasury*, 960 F.2d 187 (1st Cir. 1991), does not foreclose Mr. Harper's Fourth and Fifth Amendment claims predicated on *Bivens* and *Davis*. *See* ECF No. 12-1 at 19 (discussing *McMillen*). *McMillen* declined to extend *Bivens* to allegations that IRS agents deprived plaintiffs of liberty without due process of law because the "IRS agents … were rude, obstinate and negligent" in failing "to release a lien on the taxpayer's property." 960 F.2d at 190. Nor do *Barron v. United States*, 998 F. Supp. 117, 120-121 (D.N.H. 1998), or several other tax-collection cases that IRS cites, preclude Mr. Harper's Fourth and Fifth Amendment *Bivens* claims. ECF No. 12-1 at 19-20. *Barron* held that a *Bivens* remedy cannot be applied to actions of IRS agents in attempting to collect tax liability. In both cases Congress had provided a specific remedial scheme to address IRS's wrongful tax-

collection, tax-refund, or tax-lien practices.[2] There is no corresponding statutory remedial scheme—and IRS has not identified one either—to redress unconstitutional invasion of a person's right to privacy.

Mr. Harper does not allege IRS engaged in any wrongful tax-collection, tax-refund, or tax-lien practice. Unlike *McMillen* or *Barron*, Mr. Harper claims IRS agents obtained his private financial information without complying with the Fourth and Fifth Amendments. *See* Amended Complaint. Counts I & II, ¶¶ 86, 100-103, 106, 112, 114-115, 124-126, 129, 135. Those are straightforward *Bivens*/*Davis* claims that should survive IRS's motion to dismiss.

### D. The Administrative Exhaustion Requirement Does Not Apply to the Causes of Action at Issue Here

Faced with clear jurisdiction for Mr. Harper's three claims, IRS has finally raised an irrelevant argument about administrative exhaustion for a cause of action that has no bearing on this case. IRS says that, generally, Mr. Harper cannot be awarded any damages because he failed to exhaust administrative remedies under 26 U.S.C. § 7433(d)(1). ECF No. 12-1 at 15-16. But that statute is not the basis of any of Mr. Harper's claims. As discussed, Mr. Harper's claims lie in the Fourth and Fifth Amendments to the U.S. Constitution and concern this Court's authority to issue a declaratory judgment regarding IRS's compliance with 26 U.S.C. § 7609(f). *See* Amended Complaint, Counts I-III.

To be sure, IRS can face liability under Section 7433 for some of its misconduct, but Mr. Harper has not raised any such claim here. Thus, that provision's exhaustion requirements are of no moment. Indeed, the case IRS relies on, *Nogueras-Cartagena v. United States*, 125 F. App'x 323, 327 (1st Cir. 2005) (unpublished) proves the point for Mr. Harper. In that case the Court *separately* considered claims raised under the Federal Tort Claims Act and Section 7433. *See id.* at 326-27. Only those arising under Section 7433 were subject to the exhaustion requirement. *Id.*

---

[2] *See, e.g.*, 26 U.S.C. §§ 1346(a)(1), 7422 (tax-refund claim); 28 U.S.C. § 2410 (contesting validity of tax liens); 26 U.S.C. § 7432 (wrongful failure to release tax liens); 26 U.S.C. §§ 7432, 7433 (claim for reckless or intentional violation of any provision of the tax laws "in connection with any collection of Federal tax").

at 327. Here, of course, there are *no* claims under Section 7433, so IRS's argument simply does not apply.

## II. MR. HARPER HAS SUFFICIENTLY PLED THAT IRS VIOLATED HIS CONSTITUTIONAL AND STATUTORY RIGHTS

Having devoted most of its motion to an irrelevant fight over jurisdiction, IRS's threadbare remaining arguments about the substance of Mr. Harper's claims speak volumes. Indeed, IRS *never* defends its actions as having been authorized by statute—it simply says that its violations do not matter under the third-party doctrine. That doctrine does not give IRS a free pass, however, as IRS has frustrated Mr. Harper's reasonable expectations of privacy reinforced by contractual agreements with digital currency exchanges, and IRS has committed a trespass by seizing his private information without any lawful process.

### A. IRS Does Not Dispute It Acquired Mr. Harper's Information Without a Lawful Subpoena

Notably, IRS does not argue that Count III fails to state a claim. Indeed, IRS argues only that Counts I and II "do not assert an actionable constitutional violation against the United States." ECF No. 12-1 at 20. This concession is important—IRS has no dispute that it did not comply with the requirements set out in 15 U.S.C. § 7609(f), and that the subpoena it used to obtain Mr. Harper's records was not supported by a reasonable basis to suspect the target had violated the tax laws. *See* Amended Complaint at ¶¶ 137, 143-45.

That is a sensible concession because, as alleged in the Amended Complaint, IRS obtained Mr. Harper's private information either from an unlawful John Doe subpoena issued to Coinbase, or without *any* subpoena issued to Abra or a comparable exchange. Amended Complaint at ¶¶ 138-48. IRS only has statutory authority to issue a John Doe subpoena "where the IRS *does not know* the identity of the taxpayer under investigation," pursuant to 26 U.S.C. § 7609(f). *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 317 (1985). "Congress passed section 7609(f) specifically to protect the civil rights, including the privacy rights, of taxpayers subjected to the IRS's aggressive use of third-party summonses." *United States v. Gertner*, 65

F.3d 963, 971 (1st Cir. 1995). 26 U.S.C. § 7609(f) authorizes IRS to issue John Doe summonses for financial records only if the Secretary establishes that "(1) the summons relates to the investigation of a particular person or ascertainable group or class of persons, (2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and (3) the information sought to be obtained from the examination of the records (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources." *Id.* at 971-72.

As pled in the Amended Complaint, IRS obtained Mr. Harper's information either from Abra without any subpoena at all, which would violate 26 U.S.C. § 7609(f), or from Coinbase based on a legally inadequate subpoena. Amended Complaint at ¶¶ 138-43. The Coinbase subpoena fails, at least, the second prong under Section 7609(f). The magistrate who approved the Coinbase subpoena, whose decision is not binding on this Court, decided that the subpoena was minimally relevant under the lesser standard applicable to Section 7602 because the information sought related to "14,335 Coinbase account holders" whereas a single IRS agent had attested that "only 800 to 900 tax payers reported gains related to bitcoin in each of the relevant years." *See United States v. Coinbase, Inc.*, No. 17-cv-1431, 2017 WL 5890052, at *4 (N.D. Cal. 2017) (Scott Corley, U.S.M.J.). Further, the Magistrate Judge concluded that the users who had a series of transactions that aggregated to "at least $20,000 worth of bitcoin in a given year" may have been more likely to not have properly filed their taxes. *Id*. But this information hardly shows a reasonable basis for believing that all bitcoin users had violated the tax laws. Even if one assumes that most Coinbase users largely failed to report gains related to bitcoin, it does not follow that they likely failed to comply with the tax laws. One must receive gains to report them, and the class includes people who merely engaged in aggregate transactions—even if they only held small amounts of bitcoin for short periods of time and never realized any gain. IRS's subpoena for Coinbase records was unlawful.

15

**B. IRS Violated the Fourth Amendment**

IRS's attack on Mr. Harper's Fourth Amendment claim also fails on the merits. IRS's sole argument in defense of its unlawful data collection is its assertion that Mr. Harper "does not have an expectation of privacy in his financial information stored with a digital currency exchange that is sufficient to sustain a claim that an unreasonable search in violation of the Fourth Amendment has occurred." ECF No. 12-1 at 21. But Mr. Harper also argued that IRS's search and seizure constituted a trespass, which also violated the Fourth Amendment. *See* Amended Complaint ¶¶ 88-90. IRS ignores this latter theory entirely. In any event, IRS is wrong concerning the third-party doctrine. Mr. Harper had both a reasonable expectation of privacy in his private information *and* a property interest in that information, and IRS's warrantless searches and seizures intruded on that expectation of privacy, and separately constituted an actionable trespass

**1. The Fourth Amendment Significantly Restrains the Types of Searches IRS May Conduct**

The Fourth Amendment to the U.S. Constitution protects "the right of the people to be secure in their … papers … against unreasonable searches and seizures." There are two tests espoused by the Supreme Court for whether a "search" has occurred under the Fourth Amendment: (1) Whether the government has trespassed upon a person's property; or (2) Whether the government has intruded against a person's reasonable expectation of privacy. *United States v. Jones*, 565 U.S. 400, 405-06 (2012). Either test suffices, and even if a person lacks a reasonable expectation of privacy in a particular area, a physical trespass akin to one understood at the founding will still constitute a search. *Id*. at 406. "At bottom, the Court must assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* (citation omitted). "Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century," and now, such trespass law "provide[s] *at a minimum* the degree of protection [the Fourth Amendment] afforded when it was adopted." *Id*. at 405, 411.

The history of the Fourth Amendment shows a strong preference for warrants for protections of a person's papers. "The Fourth Amendment refers to 'papers' because the Founders understood the seizure of papers to be an outrageous abuse distinct from general warrants." Donald A. Dripps, *"Dearest Property": Digital Evidence and the History of Private "Papers" As Special Objects of Search and Seizure*, 103 J. Crim. L. & Criminology 49, 52 (2013). Thus, "[i]f one goes back to the early Republic [] it is difficult to find any federal executive body that could bind subjects to appear, testify, or produce records." Philip Hamburger, *Is Administrative Law Unlawful?* 221 (2014). "It also is apparent that privately owned papers were peculiarly protected: They were not subject even to general disclosure requirements, it being only government-owned records that were open to inspection." *Id.*

Shortly after the Civil War Congress passed a statute that granted the Secretary of the Treasury the authority in all revenue actions "other than criminal" the power to serve an investigative demand on a defendant. An Act to Amend the Customs-Revenue Laws and to Repeal Moieties, ch. 391 § 5, 18 Stat. 187 (1874). In *Boyd v. United States*, 116 U.S. 616, 638 (1886), the Supreme Court ruled that subpoenas issued under the statute were "unconstitutional and void" under the Fourth Amendment because they are akin to general warrants. The Court relied heavily on the case of *Entick v. Carrington*, 19 How. St. Tr. 1029 (1765). *Id.* at 626.

In the *Entick* decision Lord Camden had written,

Papers are the owner's goods and chattels; they are his dearest property, and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and erried away the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect.

*Id.* at 627-28 (quoting *Entick*, 19 How. St. Tr. at 1029).

According to the Court, the "principle[s] laid down" in the *Entick* opinion "affect the very essence of constitutional liberty and security." *Id.* at 630. The Court equated "a compulsory production of a man's private papers" with "[b]reaking into a house and opening boxes and

drawers." *Id*. at 622, 630. Both constituted "the invasion of his indefeasible right of personal security, personal liberty, and private property[.]" *Id*. at 630.

Later the Court in *Jones* relied heavily on "*Entick v. Carrington*," a "case we have described as a 'monument of English freedom' 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted, and considered to be 'the true and ultimate expression of constitutional law' with regard to search and seizure" to determine the proper contours of what constituted a trespass at common law. 565 U.S. at 405 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) and *Boyd*, 116 U.S. at 626).

In *Carpenter v. United States*, 138 S.Ct. 2206 (2018), the Court held, for the first time since *Boyd*, that the Fourth Amendment could require a warrant based on probable cause for the issuance of certain subpoenas. In that case federal investigators subpoenaed wireless carriers' cell-site location information records without a warrant. *Id*. at 2212. The Court held that the government "must generally obtain a warrant supported by probable cause before acquiring such records." *Id*. at 2221. The Court also said it had "never held that the Government may subpoena third parties for records in which the suspect has a reasonable expectation of privacy." *Id*. at 2221. In short, any time the government subpoenas "records held by a third party" it must first obtain a warrant "where the suspect has a legitimate privacy interest" in the records. *Id*. at 2222.

Justice Gorsuch also advocated "another way" that the case could have been resolved in Carpenter's favor—a wholesale rejection of the reasonable expectation of privacy test in favor of a trespass test. *Id*. at 2267-68 (Gorsuch, J., dissenting). "[T]he fact that a third party has access to or possession of your papers and effects does not necessarily eliminate your interest in them." *Id*. at 2268. According to Justice Gorsuch, the case might have been decided on an analysis of "*bailment*." *Id*. "A bailment is the delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose. … . A bailee normally owes a legal duty to keep the item safe, according to the terms of the parties' contract if they have one[.] A bailee who uses the item in a different way than he's supposed to, or against the bailor's instructions, is liable for conversion." *Id*. at 2268-2269 (citations omitted).

18

Justice Gorsuch also noted that this approach would accord with the common law approach to subpoenas. *Id*. at 2271. Citing to *Ex parte Jackson*, 96 U.S. 727, 723 (1878), which "held that sealed letters placed in the mail are 'as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles,'" Justice Gorsuch said, "No one thinks the government can evade *Jackson*'s prohibition on opening sealed letters without a warrant simply by issuing a subpoena to a postmaster for 'all letters sent by John Smith' or, worse, 'all letters sent by John Smith concerning a particular transaction.'" *Id*. at 2269, 2271. Thus, the relevant question for him was "What other kinds of records are sufficiently similar to letters in the mail that the same rule should apply?" *Id*. at 2271.

### 2. *Miller* Does Not Apply to this Case Because Mr. Harper Had a Contractual Expectation that His Information Would Not Be Shared

IRS's sole defense of its conduct is invocation of the third-party doctrine, and the Court's decision in *United States v. Miller*, 425 U.S. 435 (1976). ECF No. 12-1 at 22. That decision does not preclude relief for Mr. Harper because he did not voluntarily convey his information to government eyes. Instead, he contracted with Coinbase and Abra to ensure that they would *not* share his personal information without a lawful directive from the government.[3]

In *Miller*, treasury agents obtained facially invalid grand jury subpoenas for Miller's bank records and obtained bank account information from a separate financial institution. 425 U.S. at 439. The Supreme Court held that the subpoenaed documents did not "fall within a protected zone of privacy" because they were not Miller's "private papers" but were "business records of the banks." *Id*. 440. The Court "perceive[d] no legitimate 'expectation of privacy'" in the records because "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id*. at 442. Indeed, the Court said, "The depositor takes the risk,

---

[3] And as pled in Count III, which has not been challenged by IRS, there was no lawful government directive compelling production according to the terms of the contracts.

in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.*

The rationale set out by *Miller* does not apply in this case. The Court concluded that Miller's bank records were not "private papers" but were instead merely "business records of the bank" that the depositor should have expected would be revealed "to another [and] that the information will be conveyed by that person to the Government." 425 U.S. at 440, 442. The type of data was limited to "financial statements and deposit slips, [which] contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* As the *Carpenter* Court emphasized, the "third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another. But the fact of diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." 138 S.Ct. at 2219 (citation omitted). The Court also noted that the "voluntary exposure" rationale would not justify intrusions when the intrusion was so pervasive that "in no meaningful sense" did the "user voluntarily assume the risk of turning over" the data. *Id.* (citation omitted).

Here, Mr. Harper had very different expectations—he contracted with the relevant platforms to protect his personal information—so the voluntary exposure rationale does not apply. Coinbase promised to "protect [his] personal information from loss, misuse, unauthorized access, disclosure, alteration, and destruction." Amended Complaint at ¶ 25. And it promised only to turn the information over to "law enforcement [or] government officials" when it was "compelled to do so by a subpoena, court order or similar legal procedure[.]" Amended Complaint at ¶ 28. Abra similarly took "the protection and storage of [Mr. Harper's] personal data very seriously," and agreed to limit its disclosures to law enforcement to "administrative process, subpoenas, court orders, or writs from law enforcement or other governmental or legal bodies[.]" Amended Complaint at ¶¶ 60-61. Uphold, which now attests that it did not share Harper's private information, was even stronger, and required "a valid subpoena issued in connection with an official criminal investigation for the disclosure of basic subscriber records,"

"a court order issued under 18 U.S.C. § 2703(d)," or "a search warrant" issued upon "probable cause" to disclose private information to law enforcement. Amended Complaint at ¶¶ 62-63. Thus, Mr. Harper could not have expected that any of the three platforms would have disclosed this information to the government contrary to these agreements.

Alternatively, *Carpenter* recognized that the third-party doctrine no longer applies "for records in which the suspect has a reasonable expectation of privacy." 138 S.Ct. at 2221. This holding raises a related but distinct question about whether Mr. Harper contracted to keep his information private. As discussed below, the contractual agreements are strong evidence that he did in fact expect his personal information to be kept private except for limited and defined intrusions, which demonstrated his reasonable expectation of privacy. Thus, even if he could be seen to have voluntarily conveyed his information to a third party, in some limited sense, Mr. Harper's contracts still evinced his reasonable expectation of privacy in his private information.

The Eleventh Circuit recently rejected a similar attack on IRS subpoenas but is distinguishable principally because it did not discuss the consequences of the terms of service agreed to by the recordholders. In *Presley v. United States*, 895 F.3d 1284, 1290-91 (11th Cir. 2018), an accountholder invoked *Carpenter* and argued that he could challenge an IRS subpoena sent to his bank. The court agreed that neither the third-party doctrine nor the *Powell* standard for subpoenas would apply if the challengers "had a reasonable expectation of privacy in the financial records held by the Bank." *Id*. at 1291. But the court stuck to *Miller* because Presley knew the information could be sent to the IRS. *Id*. That court was not confronted, however, with any contractual language resembling the words at issue here that altered that expectation. *See id*.

The decisions IRS cites suffer from the same flaws. IRS cites two, out-of-circuit district court decisions involving the same target of a John Doe subpoena who raised Fourth Amendment challenges. *See* ECF No. 12-1 at 23 (citing *Zietzke v. United* States, 2020 WL 264394, *12-13 (N.D. Cal. Jan. 17, 2020), *report and recommendation adopted*, 2020 WL 6585882 (N.D. Cal. Nov. 10, 2020), and *Zietzke v. United States*, 426 F. Supp. 3d 758, 768-69 (W.D. Wash. 2019)).

Neither case considered the crucial effect of Zietzke's contractually expressed and protected expectation that the relevant exchanges not divulge his information without adequate process.

### 3. Mr. Harper Has a Reasonable Expectation of Privacy in His Records

A "search" occurs when the government infringes upon "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). This standard breaks down into two discrete inquiries: "first, has the [target of the investigation] manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).[4]

On the first inquiry—Mr. Harper *did* expect his information to be private according to the terms of the contracts he entered with Abra, Coinbase and Uphold. Therefore, he had a subjective expectation that his information would only be shared according to the terms of the agreements.

Mr. Harper's expectation was also reasonable. Personal papers are a person's "dearest property," and even private financial records have been jealously protected since well before the Fifth Amendment was written. *See Boyd*, 116 U.S. at 627 (quoting *Entick*, 19 How. St. Tr. at 1029). Indeed, in 1791 the concept of administrative subpoenas was so foreign to the Republic that even a statute requiring distillers to keep certain records required that "treasury officers were to supply distillers with books for recording their production of spirits" because "privately

---

[4] IRS does not dispute that the proper question under a traditional Fourth Amendment analysis is whether Mr. Harper had a "reasonable expectation of privacy." ECF No. 12-1 at 21 (quoting *Jones*, 565 U.S. at 406). This rubric is correct because, as the *Carpenter* decision made clear, not every subpoena case will be decided under the *Oklahoma Press/Powell* [379 U.S. 48 (1964)] subpoena standard. At minimum, subpoenas that intrude upon a person's reasonable expectation of privacy will be assessed under normal warrant requirements. *Carpenter*, 138 S.Ct. at 2221; *accord Presley*, 895 F.3d at 1293 ("In *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 [] (1946), the Court held that 'the basic distinction' between administrative summonses of business records and actual searches of things in which citizens hold a reasonable expectation of privacy means a separate Fourth Amendment standard applies to each circumstance."). Moreover, with respect to the alternative trespass standard, the government violates the Fourth Amendment with a trespass regardless of the reasonableness of its conduct. *Jones*, 565 U.S. at 405-06; *see also Florida v. Jardines*, 569 U.S. 1, 11 (2013) ("The *Katz* reasonable-expectations test has been *added* to, not *substituted for*, the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas.") (citation omitted).

owned records or papers" were so "peculiarly protected." Hamburger, *supra*, at 224-25. Certainly personal financial information is at least as "dear" as a distiller's production records.

After all, Mr. Harper's personal information, which included identifying information, detailed transaction information, and payment and routing information, are akin to personal papers. For example, the D.C. Circuit has held that an agency "is less free to subpoena *personal* financial information" instead of "*corporate* financial information" in reliance on "the Fourth Amendment's protection of the privacy interest that inheres in personal papers[.]" *Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544-45 (D.C. Cir. 1994).

Mr. Harper's contracts informed the reasonableness of his expectations. Courts often look to contractual agreements or policies to inform whether a person has a reasonable expectation of privacy. *See, e.g.*, *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001) (hotel's checkout procedures granted person a reasonable expectation of privacy in a room); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990) (holding an individual who was not listed as a driver on the rental agreement did not have a legitimate expectation of privacy in a car). For instance, in a case finding a reasonable expectation of privacy in email, the Sixth Circuit concluded that a limited right of access to information through a privacy policy would not defeat the expectation of privacy—which is a strong indication that a more protective privacy policy surely has relevance to the inquiry. *See United States v. Warshak*, 631 F.3d 266, 287 (6th Cir. 2010).

Mr. Harper contracted with all three platforms to protect his personal information, and all three agreed to keep his information private from government intrusion unless lawfully compelled to disclose it. *See* Amended Complaint at ¶¶ 24-28, 57-63. Uphold even insisted on a warrant or a specific type of subpoena in an active criminal investigation. Amended Complaint at ¶ 63. These provisions illustrate that it was reasonable for society to expect that this information would be kept private consistent with those agreements.

But IRS violated Mr. Harper's reasonable expectation of privacy. Mr. Harper reasonably expected that Coinbase would disclose his information only if compelled to do so, but IRS did not use lawful process to obtain the information. Indeed, IRS has no dispute that the Coinbase

subpoena was unlawful. *See* Amended Complaint, Count III. Moreover, for Abra, as there appears to have been no process used by the IRS, disclosure surely would have violated the terms of service. *See* Amended Complaint at ¶¶ 97-98. Thus, IRS certainly invaded Mr. Harper's expectations. Because there was no warrant issued, the searches would have been unlawful. *See Carpenter*, 138 S.Ct. at 2221.

### 4. Any John Doe Subpoena Was a Trespass that Violated the Fourth Amendment

"[A]t common law bailment consists of a contractual relationship resulting from the delivery of personal chattels by one person, called the bailor, to a second person, called the bailee for a specific purpose." *United States v. Sierra-Ayala*, No. CR 17-063, 2019 WL 3526491, at *2 (D.P.R. Aug. 2, 2019). "When this purpose is accomplished, the chattels must be returned or dealt with according to the bailor's direction." *Id*. New Hampshire has long held that a bailee may not "deliver[] the [bailor's] goods to others" because the "goods still remained the property of the" bailor. *Sargent v. Gile*, 8 N.H. 325, 328-29 (N.H. 1836).

"Both tangible and intangible property may be the subject of a bailment." *Liddle v. Salem Sch. Dist. No. 600*, 249 Ill. App. 3d 768, 770 (Ill. App. Ct. 5th Dist. 1993). Indeed, many courts have recognized that one may wrongly convert intangible property. *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) (collecting cases).

Here the IRS converted Mr. Harper's personal information. By entering into the contracts with the exchanges, Mr. Harper was a bailor and expected that the exchanges would not violate the agreement and give his information to the government except by lawful process. But the process was not lawful because, having come about either through a disclosure by Abra with no process or the improper Coinbase subpoena, IRS's acquisition of Mr. Harper's information did not pass muster under the Fourth Amendment warrant requirement. *See* Amended Complaint at ¶¶ 93-103. Coinbase's agreement not to divulge his information without being "compelled" to do so implies that it was lawfully compelled to act, and, as pled in Count III, and not challenged by IRS, the Coinbase subpoena was not a lawful demand for information. *See* Amended Complaint

at ¶ 95. Abra, of course, was never subpoenaed, so disclosure of information to IRS would have violated its agreement with Mr. Harper. Amended Complaint at ¶¶ 97-98.

If the search was a trespass, then it required a warrant. *See Jones*, 565 U.S. at 405. The IRS never got a warrant, though, so any search would have been unlawful.

### C. IRS Violated the Fifth Amendment

IRS gives almost no reason why Mr. Harper fails to state a Fifth Amendment claim. ECF No. 12-1 at 23-25. Mr. Harper is entitled under the Fifth Amendment's Due Process Clause to a notice and an opportunity to protect his private information from unreasonable searches and seizures. IRS concedes that it did not comply with this bare minimum due-process requirement. Indeed, a notice and opportunity to defend, IRS maintains, is impossible under I.R.C. § 7609(f). *Id.* If that is so, Mr. Harper has raised a valid claim challenging the constitutionality of 26 U.S.C. § 7609(f). It is a Fifth Amendment due process violation if a person is deprived of the right to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). IRS deprived Mr. Harper of that right.

*United States v. Bisceglia*, 420 U.S. 141 (1975), which IRS cites, ECF No. 12-1 at 24, did not address the constitutionality of the John Doe summons statute since that decision predated enactment of Section 7609(f). Nor did *Tiffany Fine Arts, Inc.*, 469 U.S. at 310, which IRS cites, ECF No. 12-1 at 25, address the constitutionality of Section 7609(f). "Cases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The [issue] was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not a binding precedent on this point."). IRS's assuming the constitutionality of Section 7609(f) and considering that assumption "beyond reproach" does not suffice to dismiss Mr. Harper's Fifth Amendment claim. Mr. Harper has stated a valid Fifth Amendment due-process claim that survives the motion to dismiss.

### CONCLUSION

IRS's motion to dismiss should be denied.

January 19, 2021

Respectfully submitted.

**Jared Bedrick**
Champions Law
170 West Road, Suite 6D
Portsmouth NH 03801
NH Bar No. 20438
(857)301-7418
jared@champions.law

**Caleb Kruckenberg**
Litigation Counsel
**Aditya Dynar**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
caleb.kruckenberg@ncla.legal
adi.dynar@ncla.legal
Appearing *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2021, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of

record.

Respectfully,

*/s/ Caleb Kruckenberg*
Caleb Kruckenberg
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC, 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
Counsel for Plaintiff
Appearing *Pro Hac Vice*